**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **vs.** | : | **Crim. No.  2:21-CR-173** |
| | : | |
| **CUSHMIR MCBRIDE** | : | |
| | : | |

---

### DEFENDANT CUSHMIR MCBRIDE'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE AND DOWNWARD VARIANCE

Cushmir McBride, through his counsel Lawrence J. Bozzelli, respectfully submits the following Defense Sentencing Memorandum in the above cited case.

Mr. McBride would respectfully recommend that this Court sentence McBride to 78 months or lower.

The defense would argue that this sentence is appropriate given (1) his unacceptable and harsh treatment while in custody; (2) his youthful age and troubled upbringing and (3) would be in line with the sentence of co-defendant McFall who also received 78 months.

In describing his childhood, the defendant said, "I would say I missed out on a lot, but it was good. My mom, she did her best and made me the man I am today. I'm glad I wasn't spoiled or spoon-fed. I won't appreciate things if I've never been through struggles." The defendant reiterated that he lacked stability throughout his upbringing. "I was a loner kid" PSR 99.

1

I.    **INTRODUCTION**

On January 20, 2022, a grand jury sitting in the Eastern District of Pennsylvania returned a 7-count Superseding Indictment charging Cushmir McBride and Nasser McFall with conspiracy to maliciously damage property used in interstate commerce by means of an explosive, in violation of 18 U.S.C. § 844(n) [Count 1], and maliciously damaging property used in interstate commerce by means of an explosive and aiding and abetting, in violation of 18 U.S.C. §§ 844(i), (2)(a) and (b) and 2 [Counts 2 through 7]. The defendant was named specifically in Counts 1, 2, 3, 4, 5, 6, of the Superseding Indictment. A Notice of Forfeiture accompanied the Superseding Indictment. See PSR 2

As of the writing of this defense sentencing memorandum, U.S. Probation has calculated the defendant's advisory guideline range as follows: 87 – 97 months based upon a Offense Level of 27 and a Criminal History Category of II.   The defense is going to argue that this level should be lower because ….

II.    **DEFENDANT'S BACKGROUND AND LIFE CIRCUMSTANCES**

Cushmir Charles McBride, was born June 30, 1999, in Philadelphia.   McBride explained that his father was "not present most of his life" and lived in California most of the time.  His mother struggled to make ends meet for Cushmir and his 4 siblings and they often moved around from place because they did not have enough money to afford stable housing. His mother recalled one time when she broke down in tears because of the stress of not being able to provide a stable housing situation.  Cushmir was a young child at the

time and told his mother "Don't cry mom; when I get older I am going to buy you a house." As Cushmir explained, his mom was loving and "always figured it out" when it came to finding food to feed her family. As reflected in the PSR, McBride indicated that he stayed with his grandmother because his mother struggled at times. "There was five of us," he commented. "She was a great mother to me. She tried her best to give me what I needed. I could see when she was struggling," he said. "She struggled, but she got it done. We ate…had clothes," he stated. PSR 96.

According to McBride, he attended a "special school" due to a learning disability. He reported that he could not read until he was approximately six or seven years old, so he was placed in special education classes. See PSR 98.

He is the only child born to the non-marital union of Terrence Peterson (age 45) and Tracey Edmonson Tidwell (age 47). The defendant's father lives in Philadelphia, while his mother resides in Upper Darby, Pennsylvania. He reported that his father earns income by designing custom tee-shirts; his mother is a clinical services associate for Penn Medicine in Philadelphia. According to the defendant, he maintains regular contact with both parents.

Cushmir grew up with a learning disability. He said that he couldn't read until the 7th grade and had to take special classes in school in order to catch up to where he should be as far as his reading level. He described himself as a "loner kid" who kept mostly to himself and did not play sports or video games. He never took up sports because he said that his family and housing situation was never stable enough to allow him to concentrate on any extracurricular activities. He said that "he missed out on a lot, but that his mom did her best"

Cushmir said that he believes that his 3 your child has autism.

### III.    POST-*BOOKER* SENTENCING IN THE THIRD CIRCUIT

After the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, just as before it, a sentencing court must correctly calculate a defendant's guideline range and then consider whether there is any basis set forth in the Guidelines Manual to "depart" from the range. However, the practical effect of *Booker* was to add a third step in the sentencing process— namely, the court's decision whether, after considering all of the factors in 18 U.S.C. § 3553(a), a sentence outside of the applicable guideline range should be imposed as a "variance."    See USSG §1B1.1, comment.    This *Booker* "three-step process" requires "respectful consideration" of the Guidelines Manual in all three steps. See *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).    The three steps are: (1) to initially calculate the sentencing range; (2) to consider policy statements or commentary in the Guidelines Manual about departures from the guideline range; and (3) to consider all of the § 3553(a) factors (which include the guidelines, commentary, and any relevant policy statements in the Guidelines Manual) in deciding what sentence to impose, whether within the applicable range, or whether as a departure or as a variance (or as both). See *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007) ("The fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." ).

A district court commits procedural error when it fails to calculate (or improperly calculates) the Sentencing Guidelines range, treats the Sentencing Guidelines as mandatory,

fails to consider the § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails adequately to explain the chosen sentence. *United States v. Genao*, 869 F.3d 136, 140 (2d Cir. 2017).

**IV.    THE PURPOSE OF SENTENCING**

The Courts have long understood that sentencing serves the purposes of retribution, deterrence, incapacitation, and rehabilitation. Deterrence, incapacitation, and rehabilitation are prospective and societal—each looks forward and asks: What amount and kind of punishment will help make society safe? In contrast, retribution imposes punishment based upon moral culpability and asks: What penalty is needed to restore the offender to moral standing within the community? *United States v. Cole*, 622 F.Supp.2d 632 (N.D. Ohio 2008)

Federal sentencing law generally tracks these purposes. Section 3553 tells the Federal Courts to choose a sentence that reflects the seriousness of the offense (retribution), promotes respect for the law (retribution, general deterrence), provides just punishment for the offense (retribution), affords adequate deterrence to criminal conduct (general deterrence), protects the public from further crimes of the Defendant (specific deterrence, incapacitation), and provides the Defendant with needed training, care, and treatment (rehabilitation). 18 U.S.C. § 3553(a)(2).

<u>RETRIBUTION</u>

One can say that "retribution" imposes punishment to reflect respect for the dignity of the victim. In other word, society stands with victims and exacts punishment in rough

approximation to the detriment caused by the defendant. This causes the Court to examine the defendant's past actions and the effect of these actions on the victim or victims of the crime. The problem is that the Court usually does not focus on the defendant's probable future positive behavior or the effect that his punishment might have on others in society [i.e., his family].

In McBride's case, the crimes he has plead guilty to involve theft from ATMs and property damage. These are serious crimes; however, the defense would point out several important points. First, many of these store had already been damaged due to the riots that occurred during this period of civil unrest. For example, the Target store in Philadelphia had already been looted prior to McBride's entry. Second, no individuals were physically harmed during the commission of these crimes. In fact, it was only the out of state crime in Delaware that involved anyone being present. Third, nothing was stolen from any person, but rather taken from the ATMs. As a result, your Honor should take this into account and not weigh this factor as heavily as others.


<u>REHABILITATION</u>

The "goal" of "rehabilitation" is the attempt to turn one person's path away from crime and towards being a productive, law-abiding citizen.

In the instant case, Cushmir McBride is already making plans to return to his family and avoid any further criminal conduct. This is the longest period of time that McBride has ever spent in jail and his time in jail has been hell. His 2 prior Criminal History points stem from a 2018 DUI and a 2015 juvenile Harassment and disorderly conduct. McBride has said

that the past 2 years that he has been in custody is an eye-opening experience that he does not want to repeat. McBride explains that while he was in custody he was savagely attacked by another inmate which was orchestrated by a specific guard at the FDC. In order to protect McBride, he was transferred to MDC Brooklyn where he spent the majority of his pre-trial incarceration.

In this case, McBride would argue that his abuse and injuries suffered while in prison are serious and traumatic. The Guidelines did not take prison abuse into their calculations when fashioning what an appropriate sentence should be. McBride has now been incarcerated for 3 years, 3 months and this has taught him well that prison is not were he belongs. Accordingly, the defense would ask your Honor to have mercy and sentence McBride to a period well below the Guidelines.


## INCAPACITATION

Incapacitation refers to the restriction of an individual's freedoms and liberties that they would normally have in society. By incapacitating the convicted offender, we prevent the individual from committing future crimes because he is removed from society and locked up or restrained somehow.

The defense would also argue that the risk of McBride committing future crimes of this nature are nil and thus incarcerating him for a long period of time is unwarranted. The logic would be that a defendant's incarceration would prevent him from committing future crimes of the same nature. The factors that lead up to these crimes [i.e., social unrest, wide-spread looting, etc.] are hopefully unlikely to reemerge anytime soon. As a result, the

conditions would not exist that permitted McBride to have the opportunity to commit these crimes.  The defense would ask your Honor to consider this when fashioning a fair sentence.

<u>DETERRENCE</u>

Deterrence has both a specific and a general function. Specific deterrence dissuades the particular defendant from engaging in criminal conduct. In contrast, general deterrence discourages others from engaging in similar criminal conduct.

Another problem with justifying punishment as a means to deter others, besides its ineffectiveness, is that it is immoral to punish one person merely to promote deterrence of others.  "Judicial punishment can never be administered merely as a means for promoting another good either with regard to the criminal himself or to civil society, but must in all cases be imposed only because the individual on whom it is inflicted has committed a crime. For one man ought never be dealt with merely as a means subservient to the purpose of another." Immanuel Kant, The Science of Right  (1790).

The Court should respectfully consider what punishment should be imposed to deter Cushmir McBride from additional criminal conduct.   As stated above, the greatest form of deterrence has been the over 3 years that McBride has spent in jail and the idea that the unique circumstance that lead to these crimes are the greatest form of deterrence.  By way of example, McBride's grandmother passed away while he was in custody.  He was very close to his grandmother and took the news of her death very hard. PSR 118.  The deterrence of returning to jail hits hard here because McBride was not able to grieve the loss of his grandmother the way one normally would such as attending her funeral or finding comfort

by surrounding yourself with loved ones.  This is one reason why a shorter sentence would serve to deter McBride just as much as a longer sentence would.

**IV.    THE APPLICATION OF DEPARTURES AND VARIANCES**

The Third Circuit specifically endorses the terminology of "departure" to refer to a sentence outside of the range that was contemplated by the guidelines system, and "variance" to refer to a sentence outside of the range that was imposed under the court's discretion pursuant to §3553(a). It asks that district courts and counsel employ this terminology as well. ***United States v. Jackson***, 467 F.3d 834, n.2 (3d Cir. 2006).

**V.    <u>DOWNWARD DEPARTURE CONSIDERATIONS</u>**

**(1) MCBRIDE'S PRIOR CRIMINAL HISTORY SUBSTANTIALLY OVER-REPRESENTS THE SERIOUSNESS OF HIS CRIMINAL HISTORY AND THE LIKELIHOOD THAT HE WILL COMMIT A CRIME IN THE FUTURE**

The Guidelines hold that "If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." USSC 4A1.3.  See ***United States v. Shoupe***, 988 F.2d 440, 444-47 (3d Cir. 1993) (vacating and remanding for resentencing after holding that a sentencing court may depart downward in the criminal history category); ***United States v. Jones***, 216 F. App'x 189 (3d Cir. 2007) (departure granted for overstated criminal history prior to ***Booker***); ***United States v. McAllister***, No. 89-0369, 1993 U.S. Dist. LEXIS 13109, at * 5 (E.D. Pa. August 9, 1993) (noting that Third Circuit had previously affirmed district court's downward departure

from criminal history category VI to criminal history category I); *United States v. Parker*, No. 00-315, 2002 U.S. Dist. LEXIS 12164 (E.D. Pa. January 3, 2002) (court granted defendant's motion for downward departure pursuant to § 4A1.3 and reduced defendant's criminal history category by two criminal history category levels, from category VI to category IV); *United States v. Sheard*, No. 01-338, 2002 U.S. Dist. LEXIS 9986, at *3 (E.D. Pa. June 3, 2002) (court granted downward departure under U.S.S.G. § 4A1.3 for a defendant with five prior convictions for robbery, theft and "small time drug dealing" whose sentences had not exceeded eleven and a half to twenty-three months); *United States v. Herrick*, 545 F.3d 53 (1st Cir.2008) (court granted departure from criminal history category IV to category III, concluding the defendant's CHC overstated the likelihood he would reoffend, particularly where his last conviction was 12 years earlier); *United States v. Senior*, 935 F.2d 149, 150 (8th Cir. 1991) (defendant with prior record of three Pizza Hut robberies at age twenty where he received concurrent sentences, and two drug selling offenses at age twenty-four, granted downward departure from career offender guideline range for federal drug offense committed at age twenty-seven); *United States v. Taylor*, 843 F. Supp. 38, 46-47 (W.D. Pa. 1993) (drug defendant entitled to downward departure from career offender guideline because prior burglary convictions were more than ten years old and occurred when defendant was teenager and his crimes did not involve any violence or use of weapons).

McBride's total of his Criminal History Category is a 2 which places him in the higher category of Criminal History Category II.    Of these 2 points, 1 point stems from  a juvenile case involving an incident in school.   At the time, McBride was only 16 years old and admitted to Harassment and Disorderly Conduct.   This stemmed from an incident at his

school when he refused to leave the teacher's lounge.   McBride explained that these incidents always coincided with trouble that was occurring inside his home. McBride had a history of moving from different types of houses when he was young due to his mother's financial situation. PSR 104.   Sadly, he brought these troubles with him to school and that caused him to behave inappropriately.   This juvenile case also occurred almost 10 years ago in 2015.   The sentence was 16 hours of community service. McBride would point to the *Taylor* case in which the Court departed when the defendant was a teenager and his crimes did not involve violence or a use of weapons.   McBride would also point to the *Herrick* case in which the District Court granted a departure and pointed out that the criminal case occurred many years prior to the sentencing.

The second point comes from a DUI in which the defendant received 6 months of probation.   McBride was 18 years old when he was arrested for the DUI.   Again, McBride would ask your Honor to take his young age and the non-violent nature of this crime when finding that a departure is warranted.     Finally, McBride would argue that neither the Disorderly Conduct juvenile matter nor the DUI offense reflect a propensity for McBride to committed further crimes like the one he has plead guilty to in this matter.

McBride would point out that the current range proposed by US Probation is 87 – 108 months based upon Offense Level 29 and Criminal History category of II.    If the Criminal History category was a I,  the range would be lower by 10 months on each end.

**(2)  MCBRIDE IS A YOUTHFUL OFFENDER**

In April 2024, the U.S. Sentencing Commission approved amendments to the Federal sentencing guidelines relating to youthful offenders. This amendment is not expected to take

11

effect until November 1, 2024, however, the defense would ask the Court to consider applying in advance of itsThe amendment makes several revisions to §5H1.1 (Age (Policy Statement)), which addresses the relevance of age in sentencing. The amended language provides more broadly that age "may be relevant in determining whether a departure is warranted." The amendment adds language specifically providing that a downward departure may be warranted in cases in which the defendant was youthful at the time of the instant offense or any prior offenses. The amendment reflects expert testimony indicating that certain risk factors may contribute to youthful involvement in criminal justice systems, while protective factors, including appropriate interventions, may promote desistance from crime. In fiscal year 2022, approximately 14% of all federally sentenced individuals were age 25 or younger at sentencing. Approximately 5% of all individuals sentenced in fiscal year 2022 were previously convicted and received criminal history points for an offense committed before the age of 18.[1] Research has shown that brain development continues until the mid-20s on average, potentially contributing to impulsive actions and reward-seeking behavior, although a more precise age would have to be determined on an individualized basis. See, e.g., U.S. SENT'G COMM'N, YOUTHFUL OFFENDERS IN THE FEDERAL SYSTEM 6–7 (2017).

The Sentencing Commission has recognized that the brain continues development until the mid-20s. The Sentencing Commission's own study found that this continued development in youthful offenders potentially contributes to impulsive behavior. Recognizing this, the amendment instructs federal district courts to take into account a

---

[1] https://www.ussc.gov/sites/default/files/pdf/amendment-process/amendments-in-brief/AIB_2024-youthful.pdf

federal criminal defendant's youth when imposing a sentence and consider a departure below the guidelines. It also recognizes that youthful offenders are more amenable to rehabilitation.

The defense would ask the Court to consider a downward departure for the following reasons.  First, the 2 prior convictions which now place McBride in a Criminal History Category of II originate from convictions that occurred when McBride was just 16 and 18 years old.  The crime of Harassment and Disorderly Conduct occurred when he was 16 years old and the crime of DUI occurred when he was just 18 years old.  The defense would ask your Honor to depart and place McBride in Criminal History Category I due to McBride's young age when he committed these prior offenses.  Second, the defense would ask your Honor to depart downward when considering McBride's age at the time of the instant offense. In this case, McBride was 21 when these crimes occurred for the reasons outlined above.

**VI.** **IMPORTANT FACTORS TO CONSIDER PRIOR TO SENTENCING PURSUANT TO § 3553(a) / VARIANCES FROM THE SENTENCING GUIDELINES**

**(1) CRIMINAL HISTORY POINTS ARE EXAGGERATED**

If your Honor does not elect to grant a downward departure based on the overstatement of the Criminal History points, McBride would ask that your Honor apply a variance instead.

McBride is a level II because of a juvenile matter that occurred almost 10 years ago in 2015 in which he refused to leave the teacher lounge and had a altercation with staff member in which he pushed and shoved him. McBride admitted to this offense and was ordered to complete 16 hours of community service.  Keep in mind that under the

Guidelines, for a juvenile offense "one point is added for an offense committed before age 18 that resulted in a juvenile or adult sentence imposed within five years of the instant offense." See USSG §4A1.2(d)(2)(B). The juvenile offense was committed on 11/30/2015. In first robbery in the instant offense occurred on 10/28/2020. If the juvenile matter had occurred just slightly over 1 month earlier, then the juvenile offense would not be counted because of the 5 year look back. This would lower the Guideline range significantly and in most cases would be around a 10 month reduction.

### (2) HARSH TREATMENT INSIDE FDC

On August 9, 2022, McBride explains that he was assaulted by an inmate and FDC guards in a plan that was orchestrated by the guards at the FDC. This was the beginning of the hostile relationship with specific guards within the FDC. McBride explains that on August 19, 2022, he was issued a "write-up" and placed in a cell with an inmate named Tyler DeBerry.[2] McBride explained that he was handcuffed and placed into a cell with DeBerry. Once inside the cell, McBride was viciously attacked by DeBerry. McBride says that during this assault his tooth was knocked out of his mouth with repeated kicks to his face. His legs were so badly beaten that his flesh was exposed and there is still a scar to prove it. His ribs were sore and he thought they were broken. The guards dragged him back to his cell and banged his body on the walls as they continued their abuse. He was bleeding badly and denied medical attention. He later caught Methicillin-resistant Staphylococcus Aureus (MRSA) due to

---

[2] Counsel was able to confirm that an inmate named Tyler DeBerry 77105-066 was housed at the FDC and it now at FDC Hazelton in connection with an attempted home invasion in Dover, DE.

unsanitary conditions. This incident raised enough suspicion at the FDC that McBride was moved from Philadelphia to FDC Brooklyn. Undersigned counsel has never seen a case in which a client was transferred from the FDC for his own safety even after being viscously assaulted inside the FDC. This includes clients that have been stabbed multiple times with homemade weapons.

In **United States v. Carty**, 264 F.3d 191, 196 (2d Cir.2001, the Second Circuit found that "no evidence exists to show that the Sentencing Commission took the conditions of a pre-sentence detainee's confinement into account in creating the Guidelines." 264 F.3d at 196. Having determined that the Guidelines did not categorically proscribe consideration of this factor, the Circuit court held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures." See also **U.S. v. Mateo**, 299 F.Supp.2d 201 (S.D. N.Y. 2004)

Thus, the Court's discretion to depart from the prescribed guidelines range in exceptional circumstances gives expression to a core principle at the heart of sentencing from time immemorial, a safety valve which recognizes that in some respect every sentence must take differential account of "individual circumstances" and, to this end, gives the judge sufficient discretion to do so. **Mateo**, 299 F.Supp.2d 201 (S.D. N.Y. 2004) In the case of *Mateo*, she was raped in prison and suffered through a painful childbirth that could have been avoidable. For these reasons, the District Court granted a 9 level downward departure.

Our Federal Courts have recognized that harsh conditions while incarcerated may warrant a downward variance. A defendant "was granted a sentencing variance for pre-trial detention as well as a below Guidelines sentence of 33 months' imprisonment due to the

harsh conditions at the MDC in Brooklyn during a blackout in January and February 2019."

***United States v. Williams***, 19-CR-5(KAM) (E.D. N.Y. Mar 22, 2021)

### (3) INFRACTIONS SHOULD BE CLOSELY EXAMINED

At first glance, McBride has several infractions while in custody.  A cursory review might lead one to think that McBride is not one to follow the rules.  However, the defense would ask your Honor to take a closer look at what the infractions stem from and more importantly, the unfair and unusual punishment that McBride received.

- On July 28, 2021, McBride was using a cell phone to communicate with his family. McBride admitted his guilt and received an appropriate punishment.

- On February 26, 2022, McBride was cited for assault without serious injury.  In the PSR, McBride is quoted as saying "I tried to avoid this.  He was pressing me."  The deeper story was that another inmate was trying to steal McBride's commissary food. McBride was only defending himself and trying to prevent another inmate from taking his food.

- On November 3, 2023, the BOP states that McBride was cited for possessing a "hazardous tool".  This hazardous tool was a phone.  McBride admitted to his guilt. Interestingly enough, McBride received 60 days of disciplinary segregation and 545 days loss of visiting privileges.  Counsel has never seen a suspension period of almost a 1 ½ years.

**(4)  MCBRIDE IS A YOUTHFUL OFFENDER**

In April 2024, the U.S. Sentencing Commission approved amendments to the federal sentencing guidelines relating to youthful offenders. The amendment makes several revisions to §5H1.1 (Age (Policy Statement)), which addresses the relevance of age in sentencing. The amended language provides more broadly that age "may be relevant in determining whether a departure is warranted." The amendment adds language specifically providing that a downward departure may be warranted in cases in which the defendant was youthful at the time of the instant offense or any prior offenses.  The amendment reflects expert testimony indicating that certain risk factors may contribute to youthful involvement in criminal justice systems, while protective factors, including appropriate interventions, may promote desistance from crime.  In fiscal year 2022, approximately 14% of all federally sentenced individuals were age 25 or younger at sentencing. Approximately 5% of all individuals sentenced in fiscal year 2022 were previously convicted and received criminal history points for an offense committed before the age of 18.[3]

**(5)  NO ADDITIONAL POINT FOR EARLY ACCEPTANCE OF RESPONSIBILITY**

McBride received a 2 point decrease in the Offense Level for acceptance of responsibility. He did not receive an additional 1 point decrease for early acceptance.  This would have brought his offense level from a 29 to a 28.  The defense would ask your Honor to apply a variance that would take this 1 point deduction into account.  Remember that McBride was housed in MDC Brooklyn for the vast majority of my representation of him.  Unable to travel to Brooklyn to see him face to face, 99% of our conversations were conducted over video

---

[3] https://www.ussc.gov/sites/default/files/pdf/amendment-process/amendments-in-brief/AIB_2024-youthful.pdf

meetings.  Often these video call were of poor quality which meant low audio volume that made it difficult to communicate with each other and video stoppages that froze the communications.  Apart from the poor quality of these calls, there is nothing that can equal a face to face discussion with your attorney.  Within days of his transfer back to FDC Philadelphia, counsel was able to have in-person meetings with McBride.  It was very soon after just 1 or 2 of our face to face conversations that McBride made the decision to change his plea.  I would argue that if McBride was housed at the FDC, it is very possible that a guilty plea would have occurred sooner.  The decision to be transferred was not McBride's fault and the defense would ask your Honor to take this into account when you fashion an appropriate sentence.

### (6) McBRIDE'S MENTAL HEALTH HISTORY

McBride attended a "special school" as a child due to his learning disability.  PSR 105. McBride explained that he could not read until he was approximately 6 or 7 years old which lead to him being placed in special education classes.  McBride's mother recalled that he was diagnosed with dyslexia and ADHD as a child and received the services of both the Delaware County Intermediate Unit and Elwyn. At Elwyn, McBride was able to receive treatment and support services given that Elwyn provides these services to those with autism, intellectual and developmental disabilities and related behavioral challenges.

### (7) THE RECIDIVISM FACTOR IS VERY LOW

These crimes were crimes of opportunity that occurred during period of riots and

social unrest in the city.  This scene of lawlessness which was broadcasted over the media created an environment that made these crimes more likely to occur. "Explosions hit 50 cash machines in and near Philadelphia the weekend of May 29, when protests over the killing of George Floyd turned violent."[4]   As we are now aware, these types of crimes have become rare and almost unheard of now that we have moved on from the unrest.  The point being is that it appears inconceivable that McBride would ever return to commit this specific crime when he is released from jail.

Moreover, with respect to general deterrence, the National Institute of Justice, part of the United States Department of Justice, has acknowledged that it is the certainty of punishment, not the severity of it, that has the most significant general deterrent effect, and that increasing the severity of punishment does little to deter crime. See National Institute of Justice, Office of Justice Programs, U.S. Dep't of Justice, Five Things about Deterrence (2014).

### (8)  MCBRIDE IS A FATHER / EFFECT ON FAMILY

One of the things that McBride has mentioned to counsel is that one of his primary concerns was for his young son.  He always thought about him and tried to provide for him. His son, Aamir McBride, is currently 3 years old. The video from the Target store on October 28, 2020, shows McBride going to the diaper section and taking diapers for his own child prior to taking money from the ATM machine.

---

[4] https://whyy.org/articles/more-dynamite-found-in-atm-explosions-case-authorities-say/;
https://www.phillyvoice.com/philadelphia-atm-explosions-delassandros-roxborough-germantown-chestnut-hill-west/





The defendant described the impact of his incarceration on his family as "bad." "It's her [his girlfriend] first child. She's young, she doesn't really have anyone. She's dealing with a lot. It's hard...she's struggling," PSR 102.

She discussed the impact of the defendant's incarceration on their family. "I wanted Cushmir to experience the newborn stage with him," she said. "My son, he doesn't have a father figure...only me. I started working because I had no money to support myself...my family helped a little. PSR 105

The mother of his child, Kareliz Nieves, confirmed the possibility of their child having Autism.  She informed the probation officer that, "It hasn't been confirmed yet...he needs to be evaluated but he's on a wait list. I was always told he has autism. He's not talking...he doesn't know his name. He can't talk, and he's three years old," she said. According to Ms. Nieves, her son participates in attention and speech therapy three times per week. PSR 113.

**(9) SENTENCE IS CONSISTENT WITH CO-DEFENDANTS**

The sentencing Guidelines advocates the need to avoid unwarranted disparities with among defendants with similar records who have been found guilty of similar conduct. 3553(a)(6).  Counsel would also argues that this principle should apply as well to co-defendants in the same criminal case.

McBride acknowledges that his McFall's Guideline range of 70-87 months was lower than his proposed Guideline range of 87-108. McBride also acknowledges that McFall's Criminal History Category of a I is lower than McBride's Category.  However, McBride asks

the Court to consider the above arguments in applying a lower than Guideline sentence.

McBride finds himself in a unique situation because the Judge who took the plea is not going to sentence him.  Undersigned counsel attended part of the sentencing hearing for co-defendant McFall and saw that Judge Pratter gave a sentence below the terms of the C plea.  The sympathy that Judge Pratter showed to co-defendant McFall was an important factor in McBride's decision to plead guilty.

VII.    **CONCLUSION**

For the reasons outlined above, Cushmir McBride would plead with the Court to sentence him to a term of incarceration of 78 months or lower.

Respectfully submitted,

LAWRENCE J. BOZZELLI
Attorney for Cushmir McBride

Date: July 2, 2024